UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

LEHMAN BROTHERS BANK, FSB,

        *Plaintiff,*

        vs.

STORE-IT, GP and SETH KINCAID,

        *Defendants.*

-----------------------------------------------------------X

CASE No.:

**NOTICE OF REMOVAL**

RECEIVED
OCT 2 4 2007
U.S.D.C. S.D.N.Y.
CASHIERS

07 CIV 9502

NEW YORK
COUNTY CLERK'S OFFICE
OCT 2 4 2007
NOT COMPARED
WITH COPY FILE

Defendants Store-It GP and Seth Kincaid, by and through their undersigned attorneys files this notice of removal under 28 U.S.C. §1446(a) and Local Civil Rule 81.1. Defendants respectively state as follows:

## INTRODUCTION

1.    Plaintiff Lehman Brothers Bank, FSB ("Lehman Bank") is a federally-charted savings bank with its executive offices in New York County, New York. Lehman Bank is a wholly owned subsidiary of Lehman Brothers Holdings, Inc., which has its principal executive offices in New York County, New York.

2.    Defendant Store-It, GP ("Store-It") is a general partnership with its principal place of business in Johnson City, TN.

3.    Defendant Seth Kincaid ("Kincaid") is the president and chief executive officer of Store-It. Defendant Kincaid is a resident of TN.

4.    Defendants were sued in New York State Supreme Court for the County of New York through a Complaint, dated September 27, 2007, for breach of contract.

5.      Defendants were served with the summons and complaint on October 1, 2007 and October 2, 2007. Defendants filed this notice of removal within the 30-day time period required by 28 U.S.C 1446(b).

6.      On October 9, 2007 Store-It commenced a class action for breach of contract against Lehman Bank by filing a class action complaint with the U.S. District Court for the Southern District of New York—Case No. 07-CV-8717 (LAP).

## BASIS FOR REMOVAL

7.      Removal is proper because there is diversity between the parties. 28 U.S.C. § 1332(a). Plaintiff's principal executive offices are in New York. None of the Defendants is a resident of New York, but rather Tennessee. The amount in controversy exceeds $75,000-- excluding interest, costs, and attorneys' fees.

8.      Additionally, the contract that forms the basis of this action contains a New York choice of law and forum provision that authorizes this action to be heard in this district court.

## REMOVAL PROCEDURES

9.      All pleadings, process, orders and other filings in the state court action are attached to this notice as required by 28 U.S.C. § 1441(a), as Exhibit A.

10.     Venue is proper in this district under 28 U.S.C. 1441 because this district embraces the place where the removed state court action has been pending.

11.     Defendants will promptly file a copy of this notice of removal with the clerk of court of the state court where the action has been pending, as appropriate.

12.     Plaintiff did not demand a jury in the state court action.

13.    By filing this Notice of Removal, defendants do not waive any defense that may be available to them, including but not limited to, the right to challenge validity of service of process, and do not concede that the allegations in the Complaint state a valid claim under applicable law.

**WHEREFORE**, Defendants respectfully request that the above-captioned action now proceeding against them in the New York State Supreme Court for the County of New York, be removed therefrom and proceed in this Court as an action duly removed.

Dated: October 23,  2007

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq. (PK 9384)
Laurence Rosen, Esq. (LR 5733)
350 Fifth Avenue, Suite 5508
New York, NY  10118
Phone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for defendants Store-It, GP, and
Seth Kincaid

## CERTIFICATE OF SERVICE

The undersigned certifies and declares as follows:

I am over the age of 18 and not a party to this action. My business address is 350 Fifth Avenue, Suite 5508, New York, New York, 10118, which is in the county where the mailing described below took place.

On October 24, 2007, I served the within NOTICE OF REMOVAL, by U.S. mail. I placed a true and correct copy thereof in a sealed envelope addressed as set forth on the attached service list and caused such envelope, with first class postage thereupon fully prepaid, to be placed in the U.S. Mail at New York, NY, and certify that such envelope was placed for collection and mailing following ordinary business practices.

I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed October 24, 2007, in New York, New York.

Typed Name: Nathan Huddell

## SERVICE LIST

Steven R. Schindler
Daniel E. Shaw
SCHINDLER COHEN & HOCHMAN LLP
100 Wall Street, 15th Floor
New York, New York 10005

Attorneys for Plaintiff Lehman Bank, FSB.

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------x

LEHMAN BROTHERS BANK, FSB,      :    Index No. 113025/07

         Plaintiff,    :

    -against-         :    **SUMMONS**

STORE IT, GP and SETH KINCAID,    :

         Defendants.    :
-------------------------------------------------------x

*FILED 9-27-07*

    TO THE ABOVE-NAMED DEFENDANTS:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on Plaintiff's Attorneys within twenty (20) days after the service of this summons,

exclusive of the day of service (or within thirty (30) days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

    The basis of the venue designated is, pursuant to CPLR § 501, a contractual provision

fixing New York County as the agreed upon place of trial.

{00033944}

Dated: New York, New York
      September 26, 2007

SCHINDLER COHEN & HOCHMAN LLP

By: _____
     Steven R. Schindler
     Daniel E. Shaw

100 Wall Street, 15th Floor
New York, New York  10005
(212) 277-6300

*Attorneys for Plaintiff*
*Lehman Brothers Bank, FSB*

Address of Defendant:

STORE IT, GP
2262 U.S. Highway 19
HOLIDAY, FL  34691-3937

Seth Kincaid
c/o The Kincaid Group, LLC
2717 E Oakland Ave., Suite 7
Johnson City, TN  37601

(00033944)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------x
                                                    :
LEHMAN BROTHERS BANK, FSB,           :          Index No. 113025/07
                                                    :
                          Plaintiff,                :
                                                    :
       -against-                                    :          **COMPLAINT**
                                                    :
STORE IT, GP and SETH KINCAID,       :
                                                    :
                          Defendants.               :
--------------------------------------------------------------x

       Plaintiff Lehman Brothers Bank, FSB ("LBB"), by its attorneys Schindler Cohen &

Hochman LLP, for its complaint against Store It, GP ("Store It") and Seth Kincaid ("Kincaid")

(collectively, "Defendants"), alleges as follows upon knowledge as to its own acts and upon

information and belief as to all other matters:

## NATURE OF THE ACTION

       1.     This is an action for breach of a written Application and Rate Lock Agreement

entered into by LBB and Store It in connection with a commercial mortgage sought by Store It.

In consideration for being able to lock in an interest rate, subject to certain defined alterations,

Store It agreed to pay certain fees and expenses, including the costs of certain "hedge"

transactions entered into by LBB to protect against future interest rate fluctuations.  Store It has

failed to reimburse LBB for losses LBB incurred under the Rate Lock Agreement in breach of its

express obligation to do so.

       2.     Moreover, Defendant Kincaid personally guaranteed any losses or other costs

LBB incurred under the Rate Lock Agreement and the Application in connection with the loan

sought by Store It.

{00033908}

**PARTIES**

3.      LBB is a federally-chartered savings bank headquartered in Delaware and with offices in New York.  LBB is engaged in the business of mortgage lending, among other activities.

4.      Store It is a general partnership with its principal place of business in Holiday, Florida.  Store It is a single purpose entity formed for the purpose of owning a commercial property known as Stor It Holiday, located in Holiday, Florida.

5.      Kincaid is an individual residing in Tennessee.  Kincaid is the president and chief executive officer of Store It.

**JURISDICTION AND VENUE**

6.      Pursuant to CPLR § 301, this Court has personal jurisdiction over Defendants because the parties contractually consented to the exclusive jurisdiction of the courts of the State of New York located in the city and county of New York.

7.      Pursuant to CPLR § 501, venue is properly laid in New York County by a contractual provision fixing New York County as the agreed upon place of trial.

**FACTS**

8.      In or about June 2007, Kincaid approached LBB seeking a mortgage loan for a commercial property located in Holiday, Florida.  Over the course of the next three months, the parties entered into multiple agreements governing the terms of the contemplated loan.

9.      On June 12, 2007, Defendants submitted to LBB an Application/Commitment Letter (the "Application") for a loan facility of $3,300,000, which was signed by Kincaid as president and chief executive officer of Store It.  The Application included a Schedule 1, which set forth the general terms of the proposed loan.  (A copy of the Application is attached hereto as

{00033908}

Exhibit A.) The Application contemplated that the interest rate of the loan would be determined in accordance with a separate Rate Lock Agreement. (*See* Application Letter at 11.)

10.    The parties then entered into a Rate Lock Agreement, dated June 15, 2007 (the "Rate Lock Agreement"), and pursuant to that Rate Lock Agreement, on June 18, 2007, Defendants set an interest rate, subject to later alteration, for their loan from LBB. (Copies of the Rate Lock Agreement and the June 18, 2007 executed rate lock form are attached hereto as Exhibits B and C, respectively.)

11.    In consideration for being able to lock in its interest rate, under the terms of the Rate Lock Agreement, Defendants agreed to pay certain fees and expenses, including the costs of "hedge" transactions (the "Hedges") which LBB entered into on June 18, 2007 to protect against future interest rate fluctuations. Under the Rate Lock Agreement, Defendants agreed to pay LBB a "Rate Lock Fee" (as defined in the Rate Lock Agreement) of $66,000 simultaneously with its execution of the rate lock. (*See* Rate Lock Agreement, ¶ 1.) Defendants made this payment of $66,000 to LBB in conjunction with its execution of the rate lock on that date.

12.    The Rate Lock Agreement also required an additional payment of $33,000 by Defendants upon request by LBB if the Treasury Yield decreased by the amount set forth and defined in the Rate Lock Agreement as the "First Decrease Amount." (*See id.*) If the Treasury Yield thereafter continued to decrease by the amount set forth and defined in the Rate Lock Agreement as the "Additional Decrease Amount," then, upon each such decrease in the amount of the Additional Decrease Amount, Defendants were obligated to pay additional successive payments of $33,000, at LBB's request. (*See id.*) These payments were intended to be held in reserve against any Hedge Losses, as defined in paragraph 4(c) of the Rate Lock Agreement.

{00033908}

13.    Furthermore, the Rate Lock Agreement provided that LBB could terminate the Hedges at its sole discretion upon the earliest occurrence of one of the following: (i) the expiration of the rate lock; (ii) Defendants' failure to accept a commitment issued by LBB; (iii) LBB's determination that no commitment would be issued; (iv) the termination of any commitment issued by LBB and accepted by Defendants pursuant to the Application; and (v) Defendants failure to comply with their obligations under the Rate Lock Agreement. (*See id.*, ¶ 4(a).)  Any Hedge Losses incurred by LBB as a result of the termination of the Hedges would be borne by Defendants, to the extent that the Hedge Losses exceeded any amounts paid by Defendants to LBB under the terms of the Rate Lock Agreement. (*See id.*, ¶ 4(b).)

14.    The Rate Lock Agreement also included a Guaranty (the "Guaranty") signed by Kincaid personally as guarantor for Store It's obligations under the Rate Lock Agreement and the Application. (*See* Guaranty, included as pages 6-7 of the Rate Lock Agreement.)

15.    On August 7, 2007, LBB sent Defendants a Commitment letter setting forth the terms for the proposed loan facility (the "August 7 Commitment").  The August 7 Commitment altered certain of the terms previously set forth in the Application Letter and provided instead for an reduced loan amount of $3,050,000 and required Defendants to submit an additional deposit of $30,500.  The August 7 Commitment was counter-signed by Kincaid as president and chief executive officer of Store It. (A copy of the August 7 Commitment is attached hereto as Exhibit D.)

16.    The loan provided for in the August 7 Commitment did not close – through no fault of LBB – and the August 7 Commitment expired.  Then, in early September, LBB proposed new loan terms to Defendants, which Defendants refused to accept.

17.    On September 19, 2007, LBB wrote to Defendants to inform them that in light of their rejection of LBB's loan terms and their failure to pay certain costs due and owing under the Rate Lock Agreement, LBB had terminated the Hedges (the "September 19 Letter"). As a result, LBB had incurred Hedge Losses and other costs of $223,455, which when netted against the various payments already made to LBB by Defendants, left Defendants owing LBB $36,955. (A copy of the September 19 Letter is attached hereto as Exhibit E.) Defendants have failed to make any payment in satisfaction of the Hedge Losses.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT AGAINST DEFENDANT STORE IT)

18.    LBB repeats and re-alleges the allegations of paragraphs 1-17, as if set forth fully herein.

19.    LBB and Store It were parties to the Application and the Rate Lock Agreement, which obligated Store It to pay for any Hedge Losses incurred by LBB in excess of the Rate Lock Payments made by Store It.

20.    LBB incurred Hedge Losses upon the termination of the Hedges, which were terminated upon LBB's determination that one or more of the termination events had occurred (*see* para. 13, *supra*).

21.    LBB requested that Store It reimburse LBB for the Hedge Losses pursuant to its obligations under the Rate Lock Agreement. However, Store It has made no payment in satisfaction of that obligation.

22.    In addition to these Hedge Losses, Store It was also obligated, pursuant to section H of the Application Letter, to pay expenses incurred by LBB in connection with the proposed loan – including, but not limited to, legal fees and disbursements and the costs of third-party underwriting and due diligence firms – to the extent they exceed the sums deposited by Store It

with LBB for such purpose. Store it paid LBB a total of $186,500 to cover required payments under the Rate Lock Agreement and the costs due pursuant to the Application.

23.    The expenses incurred by LBB in connection with the proposed loan are at least $36,955 in excess of the $186,500 that Store It had paid to LBB. Store It has failed to reimburse LBB for the Hedge Losses and other costs in excess of the amount previously paid.

24.    As a result of Store It's breach of the Rate Lock Agreement and the Application, LBB has been damaged in an amount to be determined at trial, but in no event less than $36,955, plus statutory interest, costs, and attorney's fees.

**SECOND CAUSE OF ACTION**
**(BREACH OF CONTRACT-GUARANTY AGAINST DEFENDANT SETH KINCAID)**

25.    LBB repeats and re-alleges the allegations of paragraphs 1-24, as if set forth fully herein.

26.    Defendant Kincaid executed a Guaranty obligating him to pay any sums that became due and owing to LBB pursuant to the Rate Lock Agreement and/or the Application, including all expenses, reasonable counsel fees and disbursements incurred by Lender in connection with the collection of all sums owed.

27.    LBB demanded that Kincaid pay the amounts owed by Store It pursuant to the Guaranty, Rate Lock Agreement, and the Application. Kincaid has failed to make any payment to LBB. Kincaid is, therefore, in breach of the Guaranty.

28.    As a result of Kincaid's breach of the Guaranty, LBB has been damaged in an amount to be determined at trial, but in no event less than $36,955, plus statutory interest, costs, and attorney's fees in this action.

WHEREFORE, LBB requests that this Court grant judgment in its favor and against Altadena in an amount to be determined at trial, but in no event less than $36,955, plus statutory interest, costs, and attorney's fees in this action, and for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      September 27, 2007

SCHINDLER COHEN & HOCHMAN LLP

By: _____
     Steven R. Schindler
     Daniel E. Shaw

100 Wall Street, 15th Floor
New York, New York 10005
(212) 277-6300 (tel)
(212) 277-6333 (fax)

*Attorneys for Plaintiff*
*Lehman Brothers Bank, FSB*

{00033908}

-7-

# Exhibit A

# APPLICATION/COMMITMENT LETTER

June 12, 2007

Lehman Brothers Bank, FSB
399 Park Avenue
New York, New York 10022
Attn: Edmund Moy/Mike Vergura

Re:   Property located at 2262 US 19, Holiday, Florida, commonly known as
Store It Holiday (the "Property")

Ladies and Gentlemen:

Borrower (hereinafter defined) hereby applies to Lehman Brothers Bank, FSB ("Lender") for first mortgage loan financing (hereinafter referred to as the "Loan") on the terms and conditions set forth in this Application/Commitment Letter (this "Application") including, but not limited to, the terms and conditions set forth in Schedule 1 attached hereto. The terms set forth on Schedule 1 are not intended to be all-inclusive. All references herein to "Borrower" shall mean a Single Purpose Entity (as defined herein) controlled by the undersigned.

Unless otherwise indicated in Schedule 2, Borrower hereby represents that it is or will at the time of the closing be the owner of the Property.

A.   LOAN AMOUNT.

The Loan Amount shown on Schedule 1 of this Application is the maximum amount of the Loan. The Loan Amount may be reduced, among other reasons, to the extent necessary to satisfy the Minimum Debt Service Coverage Ratio or the Maximum Loan to Value Percentage set forth on Schedule 1.

B.   COMMITMENT.

The consummation of the Loan transaction is conditioned upon the issuance by Lender of a mortgage loan commitment substantially in the form annexed hereto as Schedule 3 (the "Commitment") confirming its agreement to make the Loan upon, and subject to, the terms and conditions set forth in this Application. The Commitment may contain such modifications or supplements to the terms and conditions set forth herein as Lender shall determine. In order to proceed with the Loan transaction, Borrower shall be required to return the executed Commitment with any payments required thereby for receipt by Lender within three (3) Business Days after the date of the Commitment and to promptly comply with the terms and conditions thereof. Borrower agrees to accept any Commitment which accepts the terms and provisions of this Application without modification to the terms and conditions set forth herein.

SSL-DOCS1 1096575v4

The Lender may issue a Commitment prior to the commencement or completion of its due diligence investigations with respect to the Loan. Lender's issuance of a Commitment shall be within Lender's sole discretion. The issuance of a Commitment shall not constitute evidence of Lender's waiver, determination or approval of any matter or condition relating to the Loan as set forth herein.

C.    CONDITIONS; DUE DILIGENCE INVESTIGATIONS.

In addition to the issuance and acceptance of a Commitment, the closing of the Loan shall be conditioned upon (a) the completion by Lender and Lender's Counsel (hereinafter defined) of such due diligence investigations with respect to Borrower, its principals and the Property as Lender and Lender's Counsel shall deem appropriate (which investigations Borrower acknowledges have not been commenced as of the date hereof), (b) the execution and delivery by Borrower of definitive documentation relating to the Loan, and (c) the absence of any development which could adversely affect the Loan. All such conditions must be satisfied in a manner acceptable to Lender. If a Commitment is issued, Lender shall have the right to condition Rate Lock (as defined in Schedule 1) upon the satisfaction of the foregoing conditions. The provisions of this paragraph are not intended to be limited by any of the other provisions contained herein.

Lender's due diligence investigations shall include, but not be limited to, such physical inspections of the Property as Lender shall deem necessary and the receipt and review of the following items, each of which will be obtained at the expense of Borrower and submitted to Lender in sufficient time for Lender to adequately evaluate its acceptability, and each of which shall be in form and substance satisfactory to Lender: (i) such financial statements, rent rolls, occupancy reports, tenant sales reports (if a retail property), operating and capital budgets, leasing plans, bank statements, pay-off letters, tax returns and other reports regarding Borrower, its principals and the Property as Lender shall deem appropriate; (ii) such references, resumes and credit and other background reports (including "Lexis/Nexis" reports) regarding Borrower and its principals as Lender may request (with such reports to be obtained by Lender, at its option); (iii) a current title report for the Property and a UCC, judgment and lien search with respect to Borrower and the Property (each of which shall include copies of all exceptions and other items referred to therein); (iv) a current survey for the Property certified to Lender and such other persons or entities as Lender shall direct by a licensed surveyor acceptable to Lender; (v) all leases (or, if the Property is a multi-family or self-storage project, a standard form of lease) and reciprocal operating agreements for the Property (including all amendments and guarantees thereof); (vi) unless the Property is a multi-family or self-storage project, estoppel certificates from (1) each tenant under the leases (stating, among other things, that such tenant has taken occupancy of and has commenced its business operations in its entire leased premises and commenced payment of its entire base monthly rent), and (2) as designated by Lender, each other party under any reciprocal easement agreements; (vii) if Borrower's interest in all or any portion of the Property is a leasehold interest pursuant to a ground lease, the related ground lease (including amendments) together with an estoppel certificate from the landlord under the ground lease and, if required by Lender, an agreement from such landlord affording Lender certain protections with respect to the ground lease; (viii) evidence of casualty and liability insurance

with respect to the Property and Borrower; (ix) evidence of the compliance of the Property with applicable law; (x) copies of all organizational documents of Borrower and certificates of good standing from applicable governmental authorities with respect to Borrower; (xi) opinions of Borrower's counsel with respect to Borrower, the Property and the loan documentation; (xii) evidence of the absence of litigation affecting Borrower or the Property; (xiii) all agreements pursuant to which Borrower may be acquiring the Property, and all settlement and closing statements with respect thereto and (xiv) certificates and affidavits of Borrower, Guarantors (as defined below) and/or their respective principals with respect to certain of the above items and such other items as Lender may reasonably request. In addition, Borrower shall, at its expense, cause Lender to receive, at the closing of the Loan, a lender's title insurance policy, in form and substance and from a title insurance company satisfactory to Lender, in the amount of the Loan.

Borrower acknowledges that Lender's Counsel (hereinafter defined) shall be retained upon Borrower's submission of this Application with all required Deposits (hereinafter defined), that Lender's due diligence investigations are intended to proceed simultaneously with Lender's Counsel's preparation and scheduling for closing of the Loan, and that Lender's Counsel's activities in this regard shall not be construed as evidence of the waiver or satisfactory completion of such investigations or the agreement by Lender to enter into any financing transaction with Borrower.

D.    LOAN DOCUMENTS.

The definitive documentation for the Loan (the "Loan Documents") shall include (i) a promissory note, (ii) first deed of trust, deed to secure debt or mortgage and security agreement, (iii) an assignment of leases and rents, (iv) UCC financing statements, (v) an assignment of agreements, permits and contracts, (vi) an assignment of management agreement and subordination of management fees (which will also be executed by the property manager for the Property), (vii) if required by Lender, a lead based paint acknowledgment and indemnification agreement, and (viii) if required by Lender, an asbestos operations and maintenance agreement. Each of the Loan Documents will be non-recourse to Borrower, subject to Lender's standard carve-outs and limitations.

An absolute and unconditional guaranty of payment of the carve-outs and limitations with respect to exculpation set forth in the Loan Documents shall be executed jointly and severally by one or more financially secure persons or entities satisfactory to Lender (individually a "Guarantor" and collectively the "Guarantors"), which guaranty shall be in form and substance satisfactory to Lender and Lender's Counsel. As a condition to the closing of the Loan, Lender shall have received financial statements of such Guarantors satisfactory to Lender.

3

The Loan Documents shall also include an Environmental Indemnity Agreement from Borrower and one or more financially secure persons or entities satisfactory to Lender ("Indemnitors"). The Indemnitors shall agree to indemnify Lender (i) for all costs incurred by Lender in connection with the removal of hazardous substances from the Property, regardless of whether or not Borrower caused the presence of such hazardous substances, and (ii) against any loss, cost, damage or expense that Lender may incur, directly or indirectly, as a result of, or in connection with the assertion against Lender of any claim relating to the presence or removal of any hazardous substance on the Property. The indemnities contained in the Environmental Indemnity Agreement shall survive the satisfaction, termination or assignment of the Loan.

The Loan Documents shall provide that upon the occurrence of any default, the Loan shall bear interest at a default rate equal to the lesser of (i) the greater of (A) three percent (3%) plus the Rate, and (B) four percent (4%) plus the Citibank, N.A. base rate or an equivalent rate and (ii) the maximum rate permitted by law.

The Loan Documents shall be governed in accordance with the laws of the state where the Property is located.

E.    BORROWER'S REPRESENTATIONS.

Borrower represents to Lender that there is no action, suit or proceeding, or any governmental investigation or any arbitration, in each case pending or, to the knowledge of Borrower, threatened against Borrower, each Guarantor, its principals or the Property before any governmental or administrative body, agency or official.

Borrower represents to Lender that (i) it has provided and/or will provide to Lender (a) (except for multi-family or self-storage tenants, if applicable) true, correct and complete counterpart executed copies of all leases with tenants at the Property (and all amendments and supplements thereto and agreements collateral thereto including, but not limited to, any guarantees thereof) (collectively, the "Leases"), (b) a standard form of lease for the Property, and (c) a true, complete and correct rent roll of the Property as of the date set forth thereon (the "Rent Roll"), (ii) if previously delivered, the Rent Roll remains true, complete and correct as of the date hereof, (iii) it has neither provided nor received any notices of default with respect to the Leases, (iv) except as noted on the Rent Roll, it knows of no default of the landlord or the tenants under the Leases, (v) all tenants under the Leases are currently in occupancy, paying rent required by their respective leases and conducting operations at the Property, and (vi) it has not been notified, in writing or otherwise, by any tenant of the discontinuance of or intent to discontinue its operations at the Property. The standard form of lease must be satisfactory to Lender. All Leases and the identity of all tenants and guarantors thereof must be consistent with the information set forth in the Rent Roll and satisfactory to Lender.

SSL-DOCS1 1096575v4