Borrower shall promptly notify Lender of any facts or circumstances which result in a change to the information set forth in the Rent Roll or the representations and warranties set forth in the preceding paragraph. All such changes must be acceptable to Lender. At the closing of the Loan, Borrower shall deliver to Lender (i) a rent roll for the Property dated as of the Closing Date (the "Closing Rent Roll") which shall be consistent in form to the Rent Roll and (ii) a certification of Borrower that the Closing Rent Roll and all Leases theretofore provided to Lender by Borrower are true, correct and complete in all respects. The Closing Rent Roll must be satisfactory to Lender.

Borrower represents that all operating statements, balance sheets and profit and loss statements, federal and state income tax returns, tenant sales figures, budgets, site plans and leasing plans and all other statements, reports and information regarding the Property previously delivered to Lender or which will be delivered to Lender are or will be true, complete and correct in all material respects.

On the Closing Date, Borrower shall certify to Lender whether and to which extent there has been an adverse change in the occupancy of or conduct of business operations at the Property or the business, financial condition or results of operations of Borrower and the Property after the date hereof. Any such adverse change must be acceptable to Lender.

Borrower represents, warrants and covenants that as of the date hereof and at all times hereafter (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans or arrangements for purposes of Title I of ERISA or Section 4975 of the Code, (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.

The Loan Documents shall contain additional representations and warranties of Borrower concerning Borrower, its constituent partner(s), shareholder(s) or member(s) and the Property.

F.    SINGLE PURPOSE ENTITY.

Borrower and, to the extent required by Lender, Borrower's general partner(s), managing member(s) or principal shareholder(s), as the case may be, shall comply with the Single Purpose Entity requirements set forth in Schedule 1.

G.  LENDER'S COUNSEL.

The Loan documentation shall be prepared, and certain of the due diligence investigations outlined above shall be conducted by Stroock & Stroock & Lavan LLP, special counsel for Lender ("Lender's Counsel"), and, to the extent deemed necessary and proper by Lender and Lender's Counsel, local counsel in the State in which the Property is located.

H.  EXPENSES.

Borrower shall simultaneously herewith deposit with Lender the amount set forth on Schedule I as the "Deposit." Borrower agrees to pay, upon demand by Lender and in any event prior to closing, all recording fees and taxes and other customary closing costs and all out-of-pocket costs and expenses incurred or to be incurred by Lender in connection with the proposed Loan (including, but not limited to, legal fees and disbursements and the costs of third-party underwriting and due diligence firms ("Underwriting Costs")), to the extent they are estimated by Lender to exceed the sums theretofore paid by Borrower or deposited by Borrower with Lender for such purposes.

I.  TERMINATION.

Lender may, at any time prior to the issuance of a Commitment and at its sole discretion, decline to proceed further with respect to a financing of the Property.

If a Commitment is issued, Lender may, at its option exercised by written notice to Borrower, terminate the Commitment if any of the following events occurs:

(a)  any sale, transfer, pledge, encumbrance or assignment of the Borrower's interest in the Property or of any equitable or beneficial ownership interests in the Borrower, or any agreement is entered into for the purposes of accomplishing the same;

(b)  the occupancy of or conduct of business operations at the Property or the business, financial condition or results of operations of Borrower, any Guarantor, its principals, the Property, any tenant of the Property or any guarantor of any lease of any tenant of the Property suffers any material adverse change after the date hereof or the date of the issuance of any Commitment, or any petition of bankruptcy, insolvency or reorganization is filed by or against any such person or entity, or any tenant of the Property provides notice of its intent to discontinue or possibly discontinue the conduct of its business operations at the Property;

(c)  whether or not covered by insurance, any damage, destruction or alteration occurs with respect to the improvements located upon the Property;

(d)  Borrower breaches any provision contained in this Application or the Commitment;

(e)  Borrower has made any representation or warranty to Lender which was untrue or false when made in a material respect or which becomes untrue or false in a material respect;

SSL-DOCS1 1096575v4

(f) any condemnation proceedings are pending or threatened against the Property or any part thereof; or

(g) the failure of any condition precedent to the closing of the Loan.

Delay in the exercise of Lender's right to terminate the Commitment upon the occurrence of any of the above events, or the occurrence of any of the above events prior to the issuance of a Commitment, shall not be construed as a waiver of such right. The failure of Lender to act in any such event shall not be construed as a waiver of its right to act with respect to any subsequent event of a similar nature. Upon termination as set forth above, all of Lender's obligations pursuant to the Commitment shall cease and be of no further force and effect whatsoever.

Notwithstanding anything contained herein or in the Commitment to the contrary, any Commitment which has not otherwise been terminated in accordance with the terms hereof shall terminate on, and Lender shall have no further obligation thereunder after the date which is 15 days after the date of the Commitment or, if such date is not a Business Day (as defined below), the Business Day preceding such date.

The expiration date of the Commitment may only be extended by a written instrument executed by Lender and Borrower specifically providing for such extension. Borrower acknowledges and agrees that no course of dealing among Lender, Borrower and their respective counsel (including due diligence investigations or the negotiation or exchange of draft or final executed loan documents) prior to or after the date of the issuance or acceptance of the Commitment or the expiration date of the Commitment shall constitute an extension of such expiration date or otherwise form the basis of any claim against Lender.

J.  BROKERS.

Borrower agrees to pay and to indemnify and hold Lender harmless from any and all loss, cost or expense (including attorneys' fees and expenses) arising from the claims of any brokers or anyone claiming a right to any fees in connection with the financing of the Property. Borrower represents to Lender that it has not contracted with, nor does it know of, any broker, other than the broker described on Schedule 1 (if any) (the "Broker"), who has participated in the application for the Loan or the transactions contemplated by this Application. Notwithstanding the foregoing, Borrower shall not be responsible for separate incentive fees or other compensation, if any, owed by Lender to the Broker based on loan origination volume. Borrower acknowledges and agrees that it has made and will make such inquiries of the Broker as it deems necessary with respect to the nature or existence of any such arrangement. No agreement by Lender to pay any such fees or compensation to the Broker shall be binding upon Lender unless it is set forth in a separate written instrument that has been duly executed by Lender and the Broker.

7

K.  **MISCELLANEOUS.**

This Application, any Commitment issued hereunder and any Rate Lock Agreement or Extended Treasury Lock Agreement (as defined in Schedule 1) shall be governed under the internal laws of the State of New York, without giving effect to principles of conflicts of law.

Wherever pursuant to this Application or any Commitment issued hereunder (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein. All approvals of or waivers by Lender in respect of any of the terms, conditions or requirements of this Application or any Commitment issued hereunder must be in writing. No waiver with respect to any condition, breach or other matter shall extend to or be taken in any manner whatsoever to affect any other condition, breach or matter or affect Lender's rights resulting therefrom.

For the purposes of this Application or any Commitment issued hereunder, (i) the term "Business Day" shall mean any day other than Saturday, Sunday or any other day on which banks are required or authorized to close in New York City, (ii) the singular case shall include the plural and the plural the singular and (iii) the terms "include(s)" and "including" shall mean "include(s), without limitation," and "including, without limitation," respectively.

The Loan Documents will include provisions permitting Lender to freely transfer the servicing for all, or a portion, of its rights in the Loan and shall require Borrower to cooperate in connection with any such transfer. Borrower acknowledges that, without limiting the circumstances in which Lender may transfer the Loan, Lender may transfer the Loan in connection with a securitization involving the Loan and other assets.

Borrower may not assign, transfer or encumber any of its rights pursuant to this Application or any Commitment issued hereunder, directly or indirectly. Any attempt to make such an assignment, transfer or encumbrance shall be null and void.

Borrower hereby waives any right which it may have to a trial by jury in any action brought on this Application or any Commitment issued hereunder or in any way connected with or related to the Loan. Each of Lender and Borrower hereby agrees that any legal proceeding relating to this Application or any Commitment issued hereunder or the transactions contemplated hereby or thereby (including determination of the Rate or the Treasury Yield (as defined in Schedule 1)) shall be maintained in a state or United States court of competent jurisdiction sitting in the City and State of New York. Lender and Borrower hereby consent and submit themselves to the jurisdiction of the state and the United States courts of New York for the purposes of the adjudication of such legal proceedings.

8

This Application may be signed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Neither Borrower nor any of its principals shall solicit or negotiate the terms of any mortgage loan or other financing related to any portion of the Property until the date which is the earlier of (i) 60 days after the date hereof, (ii) termination of any Commitment issued by Lender and accepted by Borrower and (iii) the date of issuance of any Commitment by Lender containing modifications to the terms of this Application which are not acceptable to Borrower.

Lender is committed to complying with U.S. statutory and regulatory requirements designed to assist the federal government in combating money laundering and any activity which facilitates the funding of terrorist or criminal activities. The USA PATRIOT Act enhances the money laundering prevention requirements imposed on securities firms and other financial institutions. As part of our customer identification and verification procedures, Lender may ask Borrower and its principals to provide additional information as necessary to verify their identity and comply with these procedures. Until such additional information or documentation is provided, Lender may not be able to effect any transactions for the Borrower or its principals.

THIS APPLICATION IS NOT A COMMITMENT BY LENDER TO LEND (ON EITHER AN EXPRESS OR IMPLIED BASIS) AND DOES NOT IMPOSE ANY OBLIGATIONS ON LENDER. LENDER SHALL ONLY COMMIT TO MAKE A LOAN WITH RESPECT TO THE PROPERTY PURSUANT TO A COMMITMENT SUBSTANTIALLY IN THE FORM ANNEXED HERETO AS SCHEDULE 3 (WITH SUCH MODIFICATIONS OR SUPPLEMENTS TO THE TERMS AND CONDITIONS HEREOF AS LENDER SHALL DEEM APPROPRIATE) WHICH HAS BEEN SIGNED BY LENDER AND COUNTERSIGNED BY BORROWER AND DELIVERED TO LENDER TOGETHER WITH ANY REQUIRED PAYMENTS WITHIN THE TIME PERIOD REQUIRED HEREBY.

EQUAL CREDIT OPPORTUNITY ACT NOTICE

THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT PROHIBITS CREDITORS FROM DISCRIMINATING AGAINST CREDIT APPLICANTS ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, MARITAL STATUS, AGE (PROVIDED THE APPLICANT HAS THE CAPACITY TO ENTER INTO A BINDING CONTRACT); BECAUSE ALL OR PART OF THE APPLICANT'S INCOME DERIVES FROM ANY PUBLIC ASSISTANCE PROGRAM; OR BECAUSE THE APPLICANT HAS IN GOOD FAITH EXERCISED ANY RIGHT UNDER THE CONSUMER CREDIT PROTECTION ACT. THE FEDERAL AGENCY THAT ADMINISTERS COMPLIANCE WITH THIS LAW CONCERNING THIS CREDITOR IS THE OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION, 10 EXCHANGE PLAZA CENTRE, FLOOR 17, JERSEY CITY, NEW JERSEY 07302.

**SCHEDULE 1**

DISCLOSURE NOTICE

IF BORROWER'S APPLICATION FOR BUSINESS CREDIT IS DENIED, BORROWER SHALL HAVE THE RIGHT TO A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR THE DENIAL. TO OBTAIN THE STATEMENT, PLEASE CONTACT LEHMAN BROTHERS BANK, FSB, 399 PARK AVENUE, 8th FL., NEW YORK, NEW YORK 10022, ATTENTION: GORDON NICOL, (212) 526-2324, WITHIN 60 DAYS FROM THE DATE YOU ARE NOTIFIED OF OUR DECISION. LENDER WILL SEND BORROWER A WRITTEN STATEMENT OF REASONS FOR THE DENIAL WITHIN 30 DAYS OF RECEIVING BORROWER'S REQUEST FOR THE STATEMENT.

THIS APPLICATION AND ANY COMMITMENT MAY ONLY BE MODIFIED BY A WRITTEN AGREEMENT BETWEEN LENDER AND BORROWER.

THIS APPLICATION, ANY COMMITMENT ISSUED AND ACCEPTED HEREUNDER AND THE OTHER LOAN DOCUMENTS REFERRED TO OR CONTEMPLATED HEREIN REPRESENT OR WILL REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENT OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS OF THE PARTIES.

BORROWER SHALL RETURN THIS APPLICATION TO LENDER TOGETHER WITH ANY DEPOSIT REQUIRED HEREUNDER WITHIN 5 BUSINESS DAYS AFTER THE DATE FIRST SET FORTH IN THIS APPLICATION. LENDER MAY, AT ITS OPTION, RETURN THIS APPLICATION TOGETHER WITH ANY DEPOSITS SUBMITTED HEREWITH IF THIS APPLICATION IS NOT RETURNED WITH THE REQUIRED DEPOSIT WITHIN SUCH PERIOD OF TIME.

Very truly yours,

By: _____
Name: Seth Kincaid
Title: President/CEO

|  |  |
|---|---|
|  | payment shall be a payment of interest only covering the first Accrual Period collected in advance at the closing. All principal, interest and other sums payable with respect to the Loan shall be due at maturity. As used herein, the term "Accrual Period" shall mean the period commencing on the eleventh (11th) day of a calendar month and ending on the tenth (10th) day of the succeeding calendar month; provided that if the closing of the Loan occurs on other than the eleventh (11th) day of a month, the first Accrual Period shall (i) consist only of the tenth (10th) day of the month, if closing occurs on that date or (ii) commence on the date of closing and end on the next tenth (10th) day of a month. |
| Good Faith Deposit: | 1% of the maximum Loan Amount set forth herein, which will be due and payable to Lender simultaneously with Borrower's acceptance of a Commitment (as a condition to the effectiveness thereof). The Good Faith Deposit is a good faith deposit and shall be refunded to Borrower if (i) the Loan closes in accordance with the terms hereof or (ii) upon Borrower's request, provided Rate Lock has not occurred and Lender receives a release acceptable to Lender; otherwise the Good Faith Deposit shall be retained by Lender. |
| Defeasance: | After the later to occur of (i) the second anniversary of the date of transfer of the Loan in connection with a securitization involving the Loan or (ii) the fourth anniversary of the Loan closing (the "Defeasance Lock Out Date"), Borrower may cause the release of the Property from the lien of its mortgage or deed of trust by delivery of the Defeasance Deposit (as defined below) to Lender. |
|  | As used herein, the term "Defeasance Deposit" shall mean an amount equal to the sum of (1) the amount which will be sufficient to purchase non-callable "government securities" (as defined in Section 2(a)(16) of the Investment Company Act of 1940, as amended ("Government Securities")) in amounts necessary to meet the scheduled payments of principal and interest due on the Loan after the release date (including the payment due on maturity of the Loans), and (2) all fees, costs, taxes and expenses incurred or to be incurred in the purchase of such Government Securities, the substitution thereof as |

security for the repayment of the Loan and the assumption described below. A substitute borrower shall be established by Lender at Borrower's expense to assume all of Borrower's obligations under the Loan at the time of delivery of such substitute collateral. Except as may be specifically set forth herein, Borrower shall not have any right to prepay all or any portion of the Loan.

Borrower shall only be permitted to prepay the Loan in whole during the last Accrual Period of the term of the Loan. Such prepayment shall be without premium. If such prepayment occurs on a day other than the eleventh (11th) day of a month, Borrower shall also pay all interest which otherwise would have been earned on the outstanding principal balance of the Loan during the then existing Accrual Period had the prepayment not occurred.

| | |
|---|---|
| Minimum Debt Service Coverage Ratio: | 1.20x, as determined by Lender. |
| Maximum Loan to Value Percentage: | 80%, based upon the Appraisal (hereinafter defined) and Lender's determination of the current fair market value of the Property. Lender shall review, but not be bound by, the Appraisal in making its determination of the fair market value of the Property. |
| Operating Escrows: | A monthly escrow for taxes, insurance, ground rents (if applicable), water rents and other special assessments will be required. |
| Deposit: | $26,500, which includes (1) $10,000 as an advance payment against the anticipated costs of the Third Party Investigations (as described in this Schedule 1, if any), (2) $10,000, as a deposit for the fees and disbursements to be incurred by Lender's Counsel, and (3) $6,500 as a deposit for Underwriting Costs. |

3

| | |
|---|---|
| Single Purpose Entity: | Borrower shall be a "Single Purpose Entity", which shall mean an entity which does not engage in any business other than owning or operating the Property or acquire or own material assets other than the Property and incidental personal property, and which (a) maintains its assets in a way which segregates and identifies such assets separate and apart from the assets of any other person or entity, (b) holds itself out to the public as a separate legal entity from any other person or entity, (c) conducts business solely in its name, and (d) shall not have any indebtedness other than the Loan and indebtedness for trade payables incurred in the ordinary course of business. In addition, Lender reserves the right to require Borrower to comply with customary rating agency requirements for single purpose entities. |
| Third Party Investigations: | In addition to the investigations set forth in Section C of this Application, Lender shall, at Borrower's expense, commission a Phase I environmental report and an engineering report by the environmental consultant (the "Environmental Consultant") and the engineer (the "Engineer") selected by Lender. If recommended by the Environmental Consultant in the Phase I report, Lender shall require that a Phase II environmental investigation be performed at Borrowers' expense and that the results thereof be submitted to Lender in a written report. It shall be a condition to the making of the Loan that all investigations and reports of the Environmental Consultant and the Engineer be acceptable to Lender. |
| | Lender shall also commission, at Borrower's expense, a full narrative appraisal of the Property (the "Appraisal") by an appraiser (the "Appraiser") selected by Lender. It shall be a condition to the making of the Loan that the Appraisal be acceptable to Lender. |

|  |  |
|---|---|
|  | Borrower hereby authorizes Lender to engage the Appraiser, the Environmental Consultant and Engineer for the purposes described herein and (a) authorizes the Environmental Consultant, the Engineer and the Appraiser to perform such investigations, contact such persons, entities or governmental authorities and to perform such non-intrusive and intrusive investigations of the Property as they shall deem appropriate, and (b) agrees that Borrower shall not have any claim against Lender relating to the conduct by such persons of such activities or the willful misconduct or negligence of such persons in connection with such activities. |
| Replacement Reserve: | A monthly escrow deposit equal to 1/12 of an annual Replacement Reserve amount of $.10 per square foot of gross leasable space at the Property will be required. The Replacement Reserve amount may be increased based upon the Engineer's report. |
| Deferred Maintenance Reserve: | If deferred maintenance costs are identified by the engineering report for the Property delivered to Lender, Lender shall require that Borrower escrow funds equivalent to 125 percent of the deferred maintenance costs as estimated in the engineering report. All such deferred maintenance work shall be required to be completed within sixty (60) days of the closing. |
| Assumability: | Subject to the prior approval of the holder of the Loan or its agent on a discretionary basis and the payment of a 1% assumption fee. |
| Additional Encumbrances: | None during the term of the Loan. |
| Late Charge: | In the event any payment under the Loan becomes overdue, a late charge of five cents ($.05) for each dollar of the amount overdue shall become due and payable to Lender. |

5

## SCHEDULE 2

## PROPERTY DESCRIPTION

The Property shall consist of the land and improvements known as the Store It Holiday, located at 2262 US 19, Holiday, Florida, which property Borrower represents is comprised of approximately 564 units (collectively, the "Property"). As a condition to Lender's obligations under any Commitment entered into pursuant to the terms hereof, the Property shall be satisfactory to Lender.

<u>SCHEDULE 3</u>

**LEHMAN BROTHERS BANK, FSB**
399 Park Avenue, 8th Fl.
New York, New York 10022

COMMITMENT

Date of Commitment: _____, 199_

[NOTE TO PREPARER: Fill in name and address of person or entity described in 1st paragraph of Application. If a new entity has been named and is acceptable to Lehman and counsel, fill in name of new entity. Check with counsel first for name of new entity.]

_____
_____

Attention: _____

   Re:   Application ("Application") dated _____, 199_ made by _____ [NOTE TO PREPARER: Insert name from 1st paragraph of Application] to Lehman Brothers Bank, FSB, with respect to property located at [NOTE TO PREPARER: Insert address of Property] _____, commonly known as [NOTE TO PREPARER: Insert name of Project] (the "Property")

Dear Sirs:

Reference is made to the above Application. All capitalized terms not defined herein shall have the meanings ascribed to them in the Application.

Lender hereby agrees to make, and Borrower agrees to accept, the Loan on the terms, and subject to the conditions, set forth in the Application, subject to the following modified or additional terms and conditions:

[INSERT: "None", the modified or supplemental terms, or "See Exhibit A" (and attach Exhibit A containing modified or supplemental terms)]

[INSERT FOLLOWING, IF APPLICABLE: Borrower shall be required to deposit with Lender $_____ as an additional "Deposit" under the Application as a condition to the effectiveness of this Commitment.]

This Commitment shall not be effective or binding upon Lender unless the following occur on or prior to the third (3rd) Business Day after the date of this Commitment: (1) this Commitment is countersigned by Borrower in the space provided below and received by the "Attention Party" at Lender set forth below, and (2) the Good Faith Deposit and other payments required to be paid to Lender hereunder or under the Application in connection with this Commitment are paid, by wire transfer of immediately available funds to the account set forth below.

SSL-DOCS1 1096575v4

The Commitment shall terminate as of the date set forth in the Application.

Very truly yours,

**LEHMAN BROTHERS BANK, FSB**

By: _____
Name:
Title:

Lender's Account for Wire Transfers:

Chase Manhattan Bank
New York, New York
ABA 021 000 021
Account Name: Lehman Brothers Bank, FSB
Account Number: 066-614287
Attention: Christopher Polanco
Re: [NOTE TO PREPARER: Insert name of Project]

Attention Party [NOTE TO PREPARER: Insert name of person at Lehman required to receive Commitment]:_____

Acknowledged and Agreed to:

[NOTE TO PREPARER: Insert name of Borrower from address block on 1st page of Commitment]

By:
   Name:
   Title:

SSL-DOCS1 1096575v4

2

**[EXHIBIT A]**

[Delete if Not Applicable]

# Exhibit B



RATE LOCK AGREEMENT

June 15, 2007

Lehman Brothers Bank, FSB
399 Park Avenue
8th Floor
New York, New York 10022

Re: Property located at 2262 US 19, Holiday, Florida, commonly known as Store It Holiday (the "Property")

Dear Sirs:

Reference is made to that certain Application/Commitment Letter (the "Letter") dated June 12, 2007 delivered by or on behalf of the undersigned ("Borrower") to Lehman Brothers Bank, FSB ("Lender"), as the same may have been amended by amendments executed by Lender on or prior to the date hereof or which may be amended by amendments executed by Lender after the date hereof. All capitalized terms not defined herein shall have the meanings ascribed to them in the Letter. In the event a Commitment is, or has been, issued and accepted in accordance with the terms of the Letter, all references herein to the "Letter" shall include the Commitment.

This letter agreement (this "Agreement") has been entered into for the purposes of establishing the procedures for determining the Rate referred to in the Letter. This letter shall constitute the Rate Lock Agreement referred to in the Letter.

1. <u>Rate Lock Payments</u>. Simultaneously with the execution hereof, Borrower shall provide to Lender its certified check, bank check or wire transfer of immediately available funds to the account (the "Account") designated on Schedule 1 attached hereto and made a part hereof in an amount equal to the Rate Lock Payment described on Schedule 1 (the "Rate Lock Payment"). Borrower shall, within one (1) Business Day of Lender's request made at any time following (i) the first time that the Treasury Yield has decreased by the First Decrease Amount (as described on Schedule 1) or more (as determined by Lender) from the Treasury Yield at the time of the determination of the Rate (the "First Decrease") and (ii) each subsequent time that the Treasury Yield has decreased by the Additional Decrease Amount (as described on Schedule 1) or more (as determined by Lender) after the First Decrease (and regardless of whether at the time of any such request or on the date any such payment is due the Treasury Yield shall have thereafter increased above such decreased amounts), wire transfer the Additional Rate Lock Payment Amount (as described in Schedule 1) in immediately available funds to the Account as an additional Rate Lock Payment hereunder. All references herein to the Rate Lock Payment

Store It Holiday

shall be deemed to include all such additional Rate Lock Payments. The Rate Lock Payment shall be held by Lender in accordance with the terms hereof.

2. <u>Rate Lock Fees</u>. Borrower shall pay to Lender a per diem Rate Lock Fee (as described on Schedule 1), which Rate Lock Fee shall (i) accrue and be earned on the date of determination of the Rate and each day thereafter, through and including the earlier to occur of the termination of all Hedges (hereinafter defined) or the closing of the Loan, and (ii) be paid in advance in the amounts and on the dates set forth on Schedule 1. If any due date for the payment of Rate Lock Fees falls on a day which is not a Business Day, the related payment shall be due on the immediately preceding Business Day. To the extent that any portion of a Rate Lock Fee payment is unearned at closing or upon termination of all Hedges, such unearned portion shall be returned to Borrower.

3. <u>Determination of the Rate</u>. (a) The Rate shall be determined in accordance with the procedures set forth in this Section 3.

(b) Borrower may, from time to time after 9:00 a.m. and before 4:00 p.m. New York City time on any Business Day that it is also a day on which the Chicago Board of Trade is open, request Lender to provide to Borrower quotes over the telephone of the Rate.

(c) If Borrower wishes to establish the Rate on the basis of any such quote, Borrower shall orally confirm its acceptance at the time of such quote, complete the form of Determination Notice attached hereto as Schedule 2 by properly filling in the blanks set forth therein with the Rate quoted by Lender and the date of such quote, execute such form in the appropriate space provided therein and transmit via facsimile such form to Lender (to the attention of the "Attention Party" set forth on Schedule 1) at the facsimile number of Lender set forth on the signature page hereof on the same day as such quote. Borrower acknowledges that (i) Lender shall not be bound by any quotes provided to Borrower with respect to the Rate unless a Determination Notice has been properly completed, signed and returned by Borrower to Lender in accordance with the preceding sentence and (ii) Borrower shall be bound by determinations of the Rate made by Lender in good faith on the basis of Borrower's oral acceptance of any such quotes, notwithstanding Borrower's failure or refusal to complete and/or execute the Determination Notice in accordance with the terms of this Section 3(c), if Lender or any of its affiliates has entered into any interest rate hedging transactions (each, a "Hedge") on the basis of such oral acceptance. Borrower acknowledges and agrees that it shall not have any right, claim or interest in any Hedge.

(d) Borrower acknowledges and agrees that notwithstanding any determination of a Rate pursuant to this Agreement, the determination of the Rate shall remain subject to the terms and conditions set forth in the Letter, and the Rate determined hereunder shall at all times be deemed to be equal to the sum of the Applicable Spread in effect under the Letter plus the Treasury Yield at the time of the determination of the Rate (subject to any minimum Rate set forth in the Letter).